UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KRISTY MEADOWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Docket No. 1:19-CV-11825 |
| TUFTS UNIVERSITY, | ) | |
| ELIZABETH BYRNES, and | ) | |
| JOYCE KNOLL, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |

## **COMPLAINT AND JURY DEMAND**

### INTRODUCTION

1.    Plaintiff Kristy Meadows ("Plaintiff" or "Dr. Meadows") – who received a Doctor of

Veterinary Medicine Degree from the Cummings School of Veterinary Medicine at Tufts

University ("Cummings School") in 2018 and a Ph.D. from Tufts University's

Comparative Biomedical Sciences program with a concentration in Neuroscience in 2017

– has been subjected to ongoing retaliation and reputational harm since she made a good

faith report of suspected research misconduct to Tufts in 2016.  Since then, she has been

subjected to ongoing retaliation and other unlawful conduct both by Dr. Elizabeth

Byrnes, the researcher whom she reported, and by other University professors and

administrators, compounded by Dr. Joyce Knoll's dissemination of false, defamatory, and

private information about Dr. Meadows to the entire Tufts veterinary community.  Dr.

Meadows has initiated the instant action to seek redress for the harm caused by

Defendants' unlawful retaliation and violations of her statutory and common-law rights.

1

2.      Dr. Meadows knew she wanted to be a veterinarian when, at age 24, her young cat was diagnosed with a neurological disease.  She then sought out work at veterinary clinics and hospitals, where she worked as a veterinary technician.  At age 28, she went to college with the goal of going on to get a degree in veterinary medicine, and in 2010 she graduated from the University of Maryland College Park with a degree in Animal Sciences.  That fall, she began the D.V.M. program at the Cummings School.

3.      Dr. Meadows worked at veterinary clinics and hospitals throughout college and graduate school to help pay for her education, and still graduated fourth in her class in her D.V.M. program, with a cumulative GPA of 3.86. As a veterinary student, she was awarded the Merck Animal Health Veterinary Student Scholarship, which is only given to "exceptional" veterinary students, as well as the Henry L. Foster DVM Scholarship, which is for students at the Cummings School who demonstrate academic excellence and leadership ability.

4.      Dr. Meadows worked hard to get to veterinary school, and cared deeply about the quality of her work and the care she provided to the animals she treated.  So when she reviewed the final version of an article she had written with her advisor, Dr. Elizabeth Byrnes, and discovered that it contained fabricated data from an experiment they had not done, she reported the issue to Dr. Byrnes.  After Dr. Byrnes refused to make a correction, Dr. Meadows felt compelled to report the issue to the University.

5.      After Dr. Meadows reported this issue to Tufts, she faced severe and ongoing retaliation, including a delay in her progression through her Ph.D. program; interference with her research at the university; and severe damage to her reputation, including false accusations of theft.

6.      Dr. Meadows repeatedly brought this retaliation to Tufts' attention, and Tufts failed to acknowledge or address the retaliation in violation of its own policies and federal law.

7.      Since 2013, Dr. Byrnes has received over $2.1 million in federal grants from the National Institutes of Health for research relating to opioid abuse and addiction, an area with important public health consequences. Dr. Byrnes has also received $453,750 under National Institutes of Health grant R21-NS101342 starting in 2017; on information and belief, this grant was specifically based on the research for which Dr. Meadows reported that Dr. Byrnes had fabricated and/or falsified data. Tufts received a portion of the proceeds from these grants in order to offset Dr. Byrnes' "indirect costs." Tufts had strong incentives to prevent embarrassment and avoid jeopardizing its federal grant revenue by covering up Dr. Meadows' reports of misconduct, and unfortunately it did not take appropriate action to follow up on those reports or to prevent the retaliation she endured.

8.      Defendants' retaliatory conduct, and Tufts' failure to remedy the retaliation Dr. Meadows faced, have impeded Dr. Meadows' ability to get work in her field.  She has suffered substantial damages as a direct and proximate result of Tufts' actions and inactions, including reputational harm, delayed or lost career opportunities, lost earning potential, emotional distress, and other consequential damages.

## JURISDICTION AND VENUE

9.      This action arises out of Tufts University's violations of the False Claims Act, 31 U.S.C. § 3130(h), as well as its breach of contract and its and other defendants' violation of state statutes and common law.

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

12.    Plaintiff Kristy Meadows is a citizen and resident of Florida.

13.    Defendant Tufts University ("Tufts") is a private university in Medford, Massachusetts, with a total student body of approximately 11,700 students.

14.    On information and belief, Defendant Elizabeth Byrnes is a citizen and resident of Massachusetts.

15.    On information and belief, Defendant Joyce Knoll is a citizen and resident of Massachusetts.

## FACTS

### Plaintiff's Pre-Retaliation Academic History at Tufts

16.    Plaintiff enrolled as a D.V.M. student at the Cummings School in 2010.

17.    In 2012, she enrolled in the master's program in Tufts University's Comparative Biomedical Sciences program, and in 2013 she enrolled in the Ph.D. program.

18.    As part of her master's and Ph.D. program, Dr. Meadows began working in Dr. Byrnes' lab in 2012, where she conducted research on animals and studied brain sexual dimorphism as it relates to hormones and stress, as well as sex differences and hormonal alterations in the brain as a result of ischemic stroke.

19.    Tufts paid Dr. Meadows a stipend of $2266 per month for her services in Dr. Byrnes' lab. Dr. Meadows' work was within the usual scope of business of Tufts, and Dr. Meadows did not have any independent business or profession outside of Tufts that was related to her work in Dr. Byrnes' lab. The funding for Dr. Meadows' stipend derived from federal grants.

20.     Stipends of this nature are usually paid until 30 days after a student defends his or her thesis.

21.     Initially, Dr. Byrnes served as Dr. Meadows' advisor on her Thesis Advisory Committee (TAC).

22.     As of May 8, 2016, Dr. Meadows was on track to defend her thesis by July or August 2016.

### Plaintiff's Good-Faith Complaint of Suspected Research Misconduct

23.     In December 2013, Plaintiff and Dr. Byrnes wrote an article together entitled *Sex- and age-specific differences in relaxin family peptide receptor expression within the hippocampus and amygdala in rats*.

24.     The research for this article studied the pathway by which the body reacts to stress, which is important for mood disorders like anxiety and depression. Specifically, it focused on differences between male and female rats and between young and old rats in the gene expression and protein generation in the brain for two relaxin proteins, which tend to decrease stress. Because most pre-clinical studies focused only on young, male animals, understanding sex and age differences would give a much more complete picture of the neurological underpinnings of responses to stress. This is particularly important for human applications since mood disorders are more common in women and older people than in young men.

25.     Dr. Meadows' work for Dr. Byrnes and the research for this article were funded in part and supported by federal grants including National Institutes of Health grants T35-OD010963, T32-OD011165, R01-DA025674, and R03-DA034886, each of which was a federally funded research grant under the Public Health Service Act. Dr. Meadows' work

was also supported by U.S. Army Medical Research and Materiel Command grant W81XWH-06-1-0640, a federally funded grant.

26.    This article was selected for publication in the journal *Neuroscience* in October 2014.

27.    In or around August 2014, Dr. Meadows discovered data in the paper that she did not believe was supported by her and Dr. Byrnes' research. The paper indicated that a particular experiment had been done and purported to show the results, but in fact Dr. Meadows and Dr. Byrnes had not done that experiment.

28.    Dr. Meadows reported her discovery to Dr. Byrnes, who said that it was fine to publish this data, because if they had done the experiment, this data reflected the result they would have gotten. Dr. Byrnes did not deny fabricating the data for an experiment that had not been conducted.

29.    When it became clear to Dr. Meadows that Dr. Byrnes did not intend to correct this misstatement in the article, Dr. Meadows approached university administrators in an effort to resolve the matter informally.

30.    On December 15, 2015, Dr. Meadows had her first meeting with university administrators, Dr. Angie Warner (the Associate Dean of Academic Affairs at the time), and Kate Beckett (Graduate Program Manager), where she discussed her concerns about research misconduct by Dr. Byrnes.  Dr. Warner warned Dr. Meadows that, if she formally reported Dr. Byrnes, Dr. Byrnes would try to prevent her from receiving her Ph.D.  Dr. Meadows had several additional meetings with these administrators in the following months to try to determine whether there might be a way to resolve the issue informally.

31.     On March 23, 2016, Dr. Meadows met with Dr. Warner and the chair of her TAC, Dr.

Nicholas Frank.  During that meeting, Dr. Meadows told Dr. Frank for the first time

about her concerns.

32.     Dr. Frank told Dr. Meadows that he would have to tell Dr. Byrnes of her allegations, and

also warned Dr. Meadows that if she formally reported her concerns, she would likely not

get her Ph.D.

33.     On information and belief, after the March 23 meeting, Dr. Frank did inform Dr. Byrnes

of Plaintiff's concerns about research misconduct.

34.     After Dr. Byrnes was advised of the allegations, it became clear to Plaintiff that informal

resolution would be impossible.

35.     Therefore, on April 7, 2016, Dr. Meadows officially reported her concerns about research

misconduct to Dr. Kirby Johnson, whose title at the time was Director of Research

Integrity and Facilitation within the Office of the Vice Provost for Research (OVPR).  At

this time, Dr. Meadows also reported concerns about other research misconduct, animal

abuse, and violations of animal research protocols, none of which were investigated by

Tufts.

<u>The Retaliation Plaintiff Faced After Reporting Suspected Research Misconduct, Plaintiff's</u>
<u>Internal Complaints of Retaliation, and Tufts' Failure to Prevent Further Harm to Her Reputation</u>
<u>and Educational Opportunities</u>

36.     On April 11, 2016, Plaintiff sent an email to Dr. Johnson notifying him that she believed

Dr. Byrnes was maligning her to other faculty and administrators at Tufts in retaliation

for Dr. Meadows' good-faith report of research misconduct.

37.     Nothing came of that report, and on May 26, 2016, Dr. Meadows learned that Dr. Byrnes

had discontinued her stipend.

38.     On May 27, 2016, Plaintiff had a meeting with Dr. Johnson, where she again reported her

concerns about retaliation – specifically, (1) that Dr. Byrnes was telling people she was a

bad student and not getting her work done, and (2) that Dr. Byrnes had discontinued her

stipend.  Plaintiff told Dr. Johnson during this meeting that she did not feel that she was

being protected from retaliation.

39.     Dr. Johnson responded that Plaintiff was not "protected" from being retaliated against –

that retaliation was prohibited, but that Plaintiff's concerns about retaliation would be

investigated alongside the misconduct allegations and, if they were substantiated, they

would then be addressed at that time.  Plaintiff informed Dr. Warner of Dr. Johnson's

statement that retaliation of the sort she and others were suffering would be addressed

only "after the fact," and Dr. Warner responded that she was "sorry the interactions

[were] so bitter."

40.     On July 1, 2016, the fact-finder assigned to review Dr. Meadows' research misconduct

concerns issued their report.  The fact-finder found that Dr. Meadows' allegations of

research misconduct were sufficiently credible and specific that further inquiry was

warranted, and recommended a full investigation of Dr. Byrnes, and of Dr. Meadows.

Based on the evidence presented, there was no legitimate basis for Dr. Meadows to be

investigated for research misconduct, but Tufts nonetheless designated her as a

respondent.

41.     On July 14, 2016, Dr. Meadows learned that Tufts would convene an investigative

committee to examine the entirety of the research record to evaluate the accuracy of Dr.

Meadows' research misconduct allegations.  Dr. Meadows asked that the investigation

include a researcher from outside Tufts because she doubted that Tufts researchers would conclude that their own colleague, Dr. Byrnes, had committed misconduct.

42.  On July 20, 2016, Dr. Meadows was notified via letter that further consideration of her thesis would be put on hold until the OVPR investigation into the allegations she raised about misconduct was concluded.

43.  As of July 20, 2016, Dr. Meadows' thesis was complete, or close to it.

44.  There was no legitimate basis for putting Dr. Meadows' work on her thesis on hold.

45.  Indeed, Dr. Meadows was eventually permitted to complete her thesis before the OVPR investigation was concluded, but not before her progression through her Ph.D. program was delayed by approximately eight months.

46.  On July 21, 2016, Dr. Meadows emailed and called Dr. Johnson to raise concerns that the delay with her thesis was retaliatory.

47.  On July 25, 2016, Dr. Robert Bridges, a professor at the Cummings School, wrote a letter to Dr. Johnson and Dr. Diane Souvaine, the Vice Provost for Research at the time, expressing his concern that placing Dr. Meadows' thesis progression on hold pending resolution of her misconduct complaint "foster[ed] the appearance that the school [was] impeding her efforts to complete her degree, a direct violation of the requirement for Tufts to *protect a whistle blower*" (emphasis in original).

48.  On August 1, 2016, Plaintiff reviewed the Ph.D. program committee meeting minutes from June 15, 2016, where her thesis was discussed (she was allowed to review these minutes, but she was not permitted to have a copy of them).

49.  Based on Plaintiff's review of the Ph.D. program committee minutes, it appeared that her filing of the research misconduct complaint had been discussed at the meeting – which

involved the members of her TAC as well as all members of the Ph.D. program

committee – in violation of Tufts' policy that research misconduct complaints be kept

confidential to the extent possible.  This made Plaintiff vulnerable and subject to

additional retaliation.  In addition, because Plaintiff was named as a respondent in the

investigation, the fact that Tufts failed to maintain confidentiality as required by policy

made it more likely that others within and outside Tufts would learn that Plaintiff had

been investigated for research misconduct.

50.     On August 9, 2016, Plaintiff received an email from Dr. Johnson about the retaliation

concerns she raised with him on April 11.  In his email, he sent Plaintiff the contact

information for the Office of Equal Opportunity ("OEO"), and told her that if she wished

to pursue her allegations of retaliation at Tufts, she should contact the Office of Equal

Opportunity.

51.     In fact, it is Dr. Johnson's office – the OVPR – not OEO – that handles complaints of

retaliation for reporting research misconduct at Tufts. The Tufts Policy on Scientific

Integrity in Research provides, "[T]he [] Vice Provost for Research [] reviews instances

of alleged retaliation for appropriate action. Individuals should immediately report any

alleged or apparent retaliation to the [] Vice Provost for Research."

52.     The same policy also states: "Tufts University has a zero tolerance policy against

retaliation against [] individuals [who bring allegations of research misconduct] in

employment or other status at the institution."

53.     On August 10, 2016, Dr. Meadows responded to Dr. Johnson, reiterating that, in her

April, May and July communications to him, she had been raising concerns that she was

being retaliated against for reporting suspected research misconduct.  Dr. Johnson

responded that the OVPR was incorporating her concerns regarding retaliation into its misconduct process, but that she could also report her concerns to OEO (which, again, was not responsible for addressing these concerns).

54. On September 15, 2016, Dr. Meadows received an email from Dr. Simin Nikbin Meydani, who had just begun her tenure as Vice Provost for Research at Tufts.  In her email she introduced herself, told Dr. Meadows that she was aware that she had raised concerns about retaliation, and assured her that retaliation was an issue she took very seriously.  She also asked to schedule a meeting with Dr. Meadows so that she could learn more about Dr. Meadows' concerns.

55. On September 27, 2016, Dr. Johnson emailed Dr. Meadows to ask for her help in locating certain materials related to the research she performed in Dr. Byrnes' lab.  Only a small fraction of the materials had any relation to Dr. Meadows' research misconduct complaint.  Dr. Meadows subsequently worked diligently with Dr. Johnson to provide him with all of the materials she had in her possession.

56. On September 29, 2016, Plaintiff had her first and only conversation with Dr. Meydani – a 30-minute phone call.  Dr. Meydani explained to Plaintiff that her office could handle a retaliation investigation in one of two ways – appoint a single independent investigator, or convene a committee.  She said she hoped to begin an investigation immediately, because she understood that Plaintiff felt that she was working in a hostile environment.

57. On October 4, 2016, Plaintiff sent a written summary of her concerns about retaliation as of that date to Dr. Meydani.  Dr. Meydani responded and thanked her for her email.

58.     On October 27, 2016, Plaintiff received a letter from Dr. Meydani informing her that she

        had convened a committee of three individuals to investigate Plaintiff's concerns about

        retaliation ("Retaliation Investigation Committee").

59.     Also on October 27, 2016, Plaintiff attended her first TAC meeting since her TAC had

        been reconstituted.  During the meeting, one of the members of the committee challenged

        the legitimacy of the underpinnings of Plaintiff's thesis – underpinnings that he and the

        other members of the committee had approved before Plaintiff initiated her misconduct

        complaint.

60.     Dr. Meadows continued to send emails to Dr. Meydani on numerous occasions through

        2016 and 2017, informing her of specific instances of retaliation by Dr. Byrnes and

        others. To the extent Dr. Meydani responded to these emails at all, her response was

        generally to state that the Retaliation Investigation Committee would consider the issues

        Dr. Meadows was raising – although, on information and belief, many of the allegations

        Dr. Meadows raised were not actually provided to that committee.

61.     On November 18, 2016, Plaintiff had her first meeting with the Retaliation Investigation

        Committee, and the following day she provided documents and information requested by

        the committee.

62.     On December 7, 2016, Dr. Meadows received an email from Dr. Meydani informing her

        that, despite Tufts' best efforts, it had been unable to identify a researcher from outside of

        Tufts University to join the research misconduct investigation as Dr. Meadows had

        requested, and that a committee would be convened consisting entirely of Tufts

        University faculty.   This was almost eight months after Dr. Meadows formally reported

        the suspected research misconduct, and almost five months after Dr. Meadows received a

letter from Tufts notifying her that there would be an investigation into the research at issue. Dr. Meadows was subsequently interviewed in connection with this investigation on January 26, 2017.

63.     On February 27, 2017, Plaintiff sent an email to Drs. Meydani and Johnson to notify them that she would be doing research with Dr. Sandra Ayres, a Cummings School professor, in the Peabody Pavilion.  Plaintiff explained that she wanted to alert them in advance that she would be doing work in that building because that is the building where Dr. Byrnes also worked, and because Dr. Byrnes had previously made false allegations against Plaintiff.

64.     In March 2017, Tufts informed Dr. Meadows that she would be permitted to defend her thesis, the final step in her progression through her Ph.D. program, and sent a notification of her thesis defense to Cummings School community members.  The retaliation against Dr. Meadows continued unabated.

65.     A member of the Ph.D. program committee approached Dr. Bridges after receiving the notification of Dr. Meadows' thesis defense, and expressed concern that she was being permitted to defend her thesis because Dr. Byrnes had said that Dr. Meadows' TAC had not approved the writing of her thesis, let alone her defense.

66.     There was nothing in Dr. Meadows' academic record to justify this expression of concern.  This is one example of how widely the retaliatory disparagement had spread, and of the impact it had on Dr. Meadows' reputation.

67.     Also in or around March 2017, Plaintiff was scheduled to work again with Dr. Ayres in the Peabody Pavilion, where Dr. Byrnes also worked.  In an effort to avoid retaliatory

conduct that might impede their work, Plaintiff again emailed Drs. Meydani and Johnson in advance to let them know that she would be doing this work.

68.     Dr. Ayres also scheduled a meeting with Dr. Knoll, the department head at the time, to notify her that Dr. Meadows would be doing work in the Peabody Pavilion.  After Dr. Ayres notified Dr. Knoll that Plaintiff would be working in the building, Dr. Knoll suggested that Dr. Ayres find another student, and Dr. Knoll said that Dr. Byrnes had already attempted to bar Plaintiff from the building.

69.     On information and belief, on this occasion and others, Dr. Knoll and Tufts made no effort to stop the retaliation against her or mitigate its effects; instead, Dr. Knoll and Tufts enabled and furthered the retaliatory conduct.

70.     After this conversation, Dr. Ayres spoke directly with Dr. Byrnes to let her know that Dr. Meadows would be in the Peabody Pavilion.  Dr. Byrnes said, among other things, that she needed to know the exact dates and times that Dr. Meadows would be in the building because she did not feel comfortable being in the building with Dr. Meadows alone, and that there had been issues with missing data, implying that Dr. Meadows stole that data.

71.     On March 15, 2017, Dr. Meadows sent an email to Drs. Meydani and Johnson alerting them to these additional retaliatory acts.  This was one of Dr. Meadows' many retaliation complaints to which she received no response at all.

72.     On March 17, 2017, Dr. Meadows received the Research Misconduct Allegation Investigation Committee's report. As she anticipated, the committee, made up solely of Tufts faculty, found no misconduct by Dr. Byrnes or by Dr. Meadows. Tufts provided Dr. Meadows with less time to respond to the report than required by Tufts' policies; when Dr. Meadows did submit a response (in which she raised questions about the adequacy of

the investigation as well as additional concerns about the retaliation she faced and Tufts' inadequate response), she received no follow-up.

73.     In or around April 2017, Dr. Meadows encountered further barriers to doing her work at Tufts as a result of ongoing retaliation.  Dr. Meadows needed to do additional work in Dr. Ayres' lab in the Peabody Pavilion, but Dr. Byrnes objected to Dr. Meadows being in the building unless Dr. Ayres was also present, and Dr. Ayres was not always available to be present in the lab with Dr. Meadows. On various occasions when Dr. Byrnes voiced objections, Dr. Meadows was not able to work in Dr. Ayres' lab.

74.     At around the same time, the Director of the Laboratory Animal Medicine Service, Dr. David Lee-Parritz, asked Dr. Ayres to withdraw her request to add Dr. Meadows on an IACUC protocol (the protocol necessary to permit Dr. Meadows to do research with animals). As a favor to Dr. Lee-Parritz, Dr. Ayres dropped Dr. Meadows from that protocol; as a result, Dr. Meadows lost an opportunity to work with Dr. Ayres on that project.

75.     On information and belief, in or around May 2017, Dr. Knoll again suggested to Dr. Ayres that she choose a student other than Dr. Meadows to help her with her research, because Dr. Byrnes had advised Dr. Knoll that there was evidence that Dr. Meadows stole data from Dr. Byrnes' lab. Dr. Meadows did not steal data from Dr. Byrnes' lab and was never provided with any evidence to support the allegation that she had.

76.     On August 1, 2017, Plaintiff attended a second interview with the Retaliation Investigation Committee.  Based on comments made by the members of the committee during this interview, it appeared that the committee was not aware of multiple retaliation concerns Plaintiff raised to Dr. Meydani in 2017.

77.   This second interview was conducted 16 months after the first report of retaliation Dr.

Meadows made in April 2016, 11 months after she spoke on the phone with Dr. Meydani,

and 9 months after her first interview.  It was not until December 2017 that the committee

issued a report finding that Plaintiff had not been retaliated against, despite ample

evidence of retaliation, much of which the committee appears not to have considered.

### Plaintiff's Complaint to ORI

78.   On September 15, 2017, after it was clear to her that Tufts was not going to do anything

to address the retaliation she faced, Plaintiff filed a complaint with the Office of Research

Integrity within the United States Department of Health and Human Services regarding

Tufts' failure to comply with the whistleblower protection requirement set forth in 42

CFR Part 50.103(d)(13) to undertake "diligent efforts, as appropriate, to protect the

positions and reputations of those who, in good faith, make allegations [of research

misconduct]."

79.   In response to Plaintiff's complaint, ORI reviewed materials submitted by Plaintiff and

Tufts.

80.   On information and belief, ORI is still waiting for additional information from Tufts in

connection with its inquiry and has not resolved Plaintiff's complaint.

### Tufts' Ongoing Retaliation Against Plaintiff

81.   After Plaintiff pursued retaliation complaints internally and through ORI, the retaliation

she suffered only got worse, yet Tufts continued to do nothing in response.

82.   For example, near the end of January 2018, Dr. Meadows was again falsely accused of

theft. After Dr. Byrnes' post-doctoral fellow at the time, Fair Vassoler, could not find a

secondary antibody that she and Dr. Byrnes were using for their experiments, she went

into Dr. Ayres' lab and found a box in the freezer with Dr. Meadows' name on it that
contained the same secondary antibody. Dr. Meadows was then accused of stealing their
antibody. Dr. Ayres subsequently provided proof that she had purchased the antibody that
was in her own freezer. After Dr. Ayres provided the invoice, the Byrnes lab found their
antibody in their own lab refrigerator, but the harm to Dr. Meadows' reputation had
already been done.

83.     Sometime in February or March 2018, Dr. Byrnes told members of the lab animal staff
that someone came into her animal room in the building 20 vivarium and removed the
cage cards from all of her animal cages and threw them in the trash. Dr. Byrnes
communicated that this affected her experiment because she could no longer identify
which animal was which, and if the lab animal staff did not remove the cards, then it
must have been Dr. Meadows, who came in and did it to ruin Dr. Byrnes' experiment.

84.     Dr. Meadows did not have access to the vivarium at the time, and had not done anything
to affect Dr. Byrnes' research.

85.     Also in March 2018, after Dr. Ayres added Dr. Meadows to her IACUC protocols so that
Dr. Meadows could do work for her elective that was beginning in early April, Dr. Lee-
Parritz requested to have a meeting with Dr. Ayres. The previous year, Dr. Lee-Parritz
had imposed restrictions on Dr. Meadows' use of the vivarium because of negative
comments by Dr. Byrnes. During this meeting, Dr. Lee-Parritz asked if Dr. Ayres and Dr.
Meadows would be doing any live rat work in the building 20 vivarium. Dr. Ayres
advised him that none was scheduled, but she added Dr. Meadows just in case something
came up. Dr. Lee-Parritz discouraged Dr. Ayres from including Dr. Meadows on the
protocol, and stated that he would not have discussed the issue if it had been any other

student. This time, Dr. Ayres kept Dr. Meadows on the IACUC protocols despite Dr. Lee-Parritz's objections.

86. In April 2018, Dr. Meadows learned that Dr. Byrnes and her post-doctoral fellow unilaterally disposed of all material in the Peabody Pavilion freezers that had Dr. Meadows' name on it. There were at least two projects funded by Dr. Ayres that Dr. Meadows could have been working on during a two-week elective period that month, but she was unable to do so because the material she needed had been destroyed.

87. On information and belief, Dr. Byrnes stated, after throwing the materials away, that she needed space in the freezer shared by all members of the department, and therefore, she threw away anything with Dr. Meadows' name on it.

88. This conduct mirrors exactly an example of retaliation demonstrated in a video that Dr. Meadows was shown during a required ethics class she took while at Tufts.

89. Dr. Meadows reported these 2018 incidents of retaliation to Tufts on April 19, 2018.

90. Heather J. Cosier, Associate Vice Provost for Research Compliance, met with Dr. Meadows about this ongoing retaliation on June 1, 2018.

91. Despite ample evidence of retaliation, Ms. Cosier issued a report on September 25, 2018, finding no retaliation, apparently without interviewing Dr. Ayres, one of the central witnesses identified by Dr. Meadows.

92. Dr. Meadows submitted a response to Ms. Cosier's September 25 report, raising concerns about the adequacy and accuracy of her investigation, but heard nothing further from Tufts regarding its investigation or findings.

Plaintiff's Graduation and Stymied Job Search

93.   After her progression through her Ph.D. program was put on hold for approximately one
      year, Plaintiff completed the program and was awarded her Ph.D. in 2017.

94.   On May 20, 2018, Plaintiff graduated the D.V.M. program 4th in her class with a GPA of
      3.86.

95.   In the course of her career at the Cummings School, Dr. Meadows was recognized as an
      outstanding student.  For example, she won the Merck Animal Health Veterinary Student
      Scholarship (for "exceptional" veterinary students) and the Henry L. Foster DVM
      Scholarship (which is given "to encourage and recognize Tufts veterinary students who
      excel academically and demonstrate leadership," particularly those pursuing careers in
      laboratory animal medicine and the biomedical sciences), and was elected to the Phi Zeta
      Veterinary Honor Society for top veterinary students. She also consistently received
      academic honors each semester from 2010 to 2017.

96.   Additionally, Plaintiff's research with Dr. Ayres won Third Place in the Dr. Jerry Rains
      Memorial Abstract Competition of the Society for Theriogenology in July 2016, which
      was highly unusual for research not focused on large animals.

97.   Based on her record and qualifications, Dr. Meadows reasonably expected to receive an
      offer from a residency program and be able to specialize in a discipline such as pathology
      or neurology.

98.   In her last year of the program, Dr. Meadows applied for three pathology residencies. She
      got one interview, but was not hired for a residency.

99.    Dr. Meadows applied for five pathology residencies and ten neurology residencies the
       following year. She interviewed a few times, but was not offered a single residency
       position.

100.   Since her failed attempts to pursue a specialty, Dr. Meadows has worked at a few primary
       care and/or emergency veterinary practices, typically on a temporary basis. She has not
       found a long-term position or any opportunities involving research or academia.

101.   A residency, particularly a neurology residency, would enable Dr. Meadows to pursue
       substantially more prestigious, challenging, and lucrative career paths.

       Tufts' Hostile and Degrading Email, Sent to the Entire Veterinary School Campus

102.   After she graduated, Plaintiff sought, through her attorney, to have Tufts issue a
       communication to the veterinary school community that might help to restore her
       reputation.  She also sought to have Tufts reimburse her for the attorney's fees that she
       had incurred as a result of the retaliation she faced.  Subsequently, after she did not get a
       residency for a second year in a row, she also sought to obtain nominal compensation for
       her lost earning capacity.

103.   On March 8, 2019, Dr. Knoll, then Dean *ad interim* of the Cummings School of
       Veterinary Medicine, sent an email to the entire Cummings School campus disparaging
       Dr. Meadows and disclosing highly confidential information.  The wide distribution of
       this email compounded and magnified the harm to Dr. Meadows' reputation and career
       she had suffered as a result of the ongoing retaliation she faced at Tufts.

104.   The March 8 email read as follows:

> Hi Lilly
>
> I didn't know about the pathology residency applications – those don't go through the match process.  I'm surprised that I didn't see the other neurology residencies.  I feel like she keeps moving the bar and if we agreed to the higher figure, what's to prevent her just continuing to up the game.  If she's going to sue us anyway, it doesn't seem like there is any point even paying her the $30K.  Maybe we should talk this over when I get back from DC.  I might be reacting too quickly.
>
> I do have to ask –  I don't know what the neurologists here thought of Kristy.  I know at least one of our pathologist thought she was antisocial and weird.  if she got bad  recommendations from people at Tufts in the hospital, that are not linked to Liz Byrnes, can she hold that against us?  Can she require that everyone here give her a good evaluation even if it's not deserved?
>
> Joyce

105.   On information and belief, this email was intended for Tufts' in-house counsel, and was sent inadvertently to the entire Cummings School community.

106.   Because Dr. Meadows still receives email associated with her Tufts University email account, she received this email.

107.   On information and belief, hundreds of her colleagues and professors also received this email, including others, like Dr. Meadows, who have graduated from the program.

108.   Several people contacted Plaintiff to notify her that this email had been sent, including one person who anonymously mailed her a hard copy of the email.

109.   On March 11, 2019, a colleague contacted Plaintiff and told her that, while eating lunch with others at the Cummings School, she had to stick up for her.  The colleague explained to Plaintiff that a professor at Tufts had said to a group of people that Plaintiff did not deserve her D.V.M. or Ph.D. degrees.

110. This is clearly not true based on Dr. Meadows' undeniably strong performance as a student. Instead, this statement was a result and reflection of the ongoing retaliation that Dr. Meadows faced and that went unaddressed by Tufts. And Dr. Meadows was only being discussed because of Dr. Knoll's email, which many members of the Tufts community understood to refer to Dr. Meadows.

111. Dr. Byrnes and Tufts have benefited from Dr. Meadows' work by applying for and receiving National Institutes of Health grant R21-NS101342, totaling $453,750 in 2017 and 2018, on the same subject matter as Dr. Meadows' research. On information and belief, Dr. Byrnes used Dr. Meadows' research as well as fabricated data and/or materially false statements about their work in order to obtain this grant.

112. Rather than hold Dr. Byrnes accountable for her unlawful conduct, Tufts ratified her behavior by promoting her to full Professor in or about June 2019.

COUNT ONE
False Claims Act - Retaliation
31 U.S.C. § 3130(h)
(Tufts)

112. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

113. Plaintiff was an employee, contractor, and/or agent of Tufts.

114. At Tufts, Plaintiff was engaged in research that was funded, in whole or in part, with federal grants and/or other resources provided by the United States government.

115. On information and belief, in order to receive these grants and/or other resources, Tufts was required to certify that it was in compliance with federal regulations including anti-retaliation regulations, and that it would take effective action against research misconduct.

116. On information and belief, these certifications were material to the United States government's decisions to provide these grants and/or other resources to Tufts.

117. On information and belief, Tufts falsely made such certifications and received payments from the United States government as a result.

118. Plaintiff engaged in activity in furtherance of False Claims Act enforcement and/or efforts to stop one or more violations of the False Claims Act, including but not limited to:

a. Reporting misconduct in federally funded research;

b. Reporting retaliation for reporting research misconduct;

c. Reporting Tufts' failure to take action against the research misconduct Plaintiff reported, as required by Tufts' policies and federal regulations; and

d.      Reporting Tufts' failure to protect Plaintiff from retaliation as required by its own policies and federal regulations.

119.  Tufts knew of Plaintiff's activity in furtherance of False Claims Act enforcement and/or efforts to stop violations of the False Claims Act.

120.  Tufts discharged, demoted, threatened, harassed, and/or discriminated against Plaintiff in the terms and conditions of employment, including but not limited to by:

a.      Discontinuing Plaintiff's stipend;

b.      Naming Plaintiff as a respondent and investigating her for research misconduct;

c.      Delaying the progress of Plaintiff's thesis;

d.      Threatening to hinder and delay Plaintiff's graduation;

e.      Limiting the ability of Plaintiff to do research, and the conditions under which she could continue her research, including by subjecting her to increased oversight, barring her from certain facilities, and seizing and withholding research materials;

f.      Creating and/or tolerating a hostile and retaliatory work environment;

g.      Repeatedly accusing Plaintiff of theft and other misconduct without any basis;

h.      Damaging Plaintiff's reputation within the Tufts community and the broader veterinary community; and

i.      Interfering with Plaintiff's residency applications and other employment opportunities.

121.  Plaintiff's activities in furtherance of False Claims Act enforcement and/or efforts to stop violations of the False Claims Act were causes of these adverse acts.

122.  Plaintiff has suffered damages in excess of $75,000 from Tufts' unlawful acts, including but not limited to lost wages and earning capacity, damage to reputation, emotional

distress, and loss of employment opportunities.

COUNT TWO
Massachusetts Civil Rights Act
Mass. Gen. Laws ch. 12, § 11I
(All Defendants)

123.    Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated

in the previous paragraphs.

124.    Plaintiff has exercised, enjoyed, and attempted to exercise and enjoy, rights protected

under state and federal laws and constitutional provisions, including but not limited to:

a.       The right to freedom of speech under the First Amendment to the United States

Constitution;

b.       The right to freedom of speech under Article 16 of the Massachusetts Declaration

of Rights;

c.       The right to be free of retaliation for opposing false claims under 31 U.S.C. §

3130(h);

d.       The right to have Tufts make diligent efforts to protect Plaintiff's position and

reputation after she made an allegation of research misconduct, pursuant to 42 U.S.C. §

289b(e) and 42 C.F.R. § 50.103(d)(13);

e.       The right to be protected from retaliation for whistleblowing, as stated in Tufts'

policies and required by 42 U.S.C. § 289b(e) and 42 C.F.R. § 50.103(a)(2); and

f.       The rights to privacy in general and specifically with respect to her educational

records, pursuant to Mass. Gen. Laws ch. 214, § 1B, and the Federal Educational Rights

and Privacy Act and implementing regulations, 20 U.S.C. § 1232g and 34 C.F.R. Part 99.

125.    Defendants interfered with Plaintiff's exercise, enjoyment, and/or attempted exercise or

enjoyment of these rights by, among other things:

    a.      Discontinuing Plaintiff's stipend;

    b.      Threatening to hinder and delaying Plaintiff's graduation;

    c.      Disclosing private and false information about Plaintiff; and

    d.      Interfering with Plaintiff's residency applications and other employment

opportunities.

126.    Defendants' interference included threats, intimidation, and coercion, including but not

limited to economic coercion and threats of economic coercion.

127.    Plaintiff has suffered damages in excess of $75,000 from Defendants' unlawful acts,

including but not limited to lost wages and earning capacity, damage to reputation,

emotional distress, and loss of employment opportunities.


## COUNT THREE
Breach of Contract/Covenant of Good Faith and Fair Dealing
(Tufts)

128.    Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated

in the previous paragraphs.

129.    Plaintiff and Tufts had a contractual relationship, which incorporated and included the

applicable Student Handbook and other policies.

130.    In its Handbook and policies, Tufts agreed to handle Plaintiff's research misconduct

complaint with appropriate confidentiality, protect Plaintiff from retaliation for reporting

research misconduct, punish those who retaliated against Plaintiff, take action to restore

Plaintiff's reputation, and protect Plaintiff's privacy.

131.    Tufts breached these obligations, including but not limited to by failing to maintain the

confidentiality of Plaintiff's research misconduct complaint, retaliating against Plaintiff and failing to prevent or remedy such retaliation, damaging Plaintiff's reputation, and disclosing negative and private information about Plaintiff to the entire Tufts veterinary community.

132. As part of the contractual relationship between Plaintiff and Tufts, Tufts implicitly covenanted to deal with Plaintiff fairly and in good faith.

133. Tufts breached the obligation of good faith and fair dealing by, among other things, delaying Plaintiff's thesis and withholding her degree without a sound basis in retaliation for her complaint of research misconduct.

134. Plaintiff has suffered monetary and non-monetary damages from Tufts' unlawful acts in amounts to be proven at trial, but likely to exceed $75,000.

## COUNT FOUR
### Intentional Interference with Advantageous Relations
### (Defendants Tufts and Byrnes)

135. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

136. Plaintiff had actual or potential advantageous relationships with residency programs and other employment opportunities.

137. Tufts and Dr. Byrnes knew of some or all of these relationships, including those with residency programs for which Tufts and/or Dr. Byrnes was asked to provide information about Plaintiff.

138. On information and belief, Tufts and Dr. Byrnes interfered with these relationships by providing negative information about Plaintiff or otherwise inducing residency programs

and employers not to accept or hire Plaintiff.

139.   In addition, Dr. Byrnes interfered with prospective relationships by making false accusations and spreading negative information against Plaintiff with the expectation that doing so would make it more difficult for Plaintiff to find future employment.

140.   On information and belief, this interference was wrongful in means because Tufts and Dr. Byrnes provided false or defamatory information about Plaintiff to residency programs and employers.

141.   This interference was wrongful in motive because it was done in retaliation for Plaintiff's acts of filing complaints of research misconduct and participating in the investigation of those complaints.

142.   Plaintiff has suffered monetary and non-monetary damages from Defendants' unlawful acts in amounts to be proven at trial, but likely to exceed $75,000.


COUNT FIVE
Negligence
(All Defendants)

143.   Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

144.   Tufts owed Plaintiff duties including but not limited to:

a.      A duty to protect the well-being of its students;

b.      A duty to follow the Student Handbook and other applicable policies;

c.      A duty to protect the privacy of Plaintiff's educational records as that term is defined under the Federal Educational Rights and Privacy Act of 1974;

d.      A duty to train employees like Dr. Byrnes not to commit research misconduct or

retaliate against those who complain of research misconduct;

e.      A duty not to retain employees who retaliate against those who complain of research misconduct; and

f.      A duty to supervise employees like Dr. Byrnes to ensure that they do not commit research misconduct or retaliate against those who complain of research misconduct.

145.    Dr. Byrnes owed Plaintiff duties including but not limited to:

a.      A duty to teach and advise Plaintiff in good faith;

b.      Duties to promote scientific integrity, to protect the health and safety of the public, and to conserve public funds that support research;

c.      A duty to report possible research misconduct, and not to retaliate against Plaintiff for her good-faith reports of research misconduct;

d.      A duty to protect the privacy of Plaintiff's educational records as that term is defined under the Federal Educational Rights and Privacy Act of 1974;

e.      A duty to abide by Federal law and Tufts policies concerning research misconduct and retaliation; and

f.      A duty to protect the well-being of students like Plaintiff.

146.    Dr. Knoll owed Plaintiff duties including but not limited to:

a.      A duty to protect the privacy of Plaintiff's educational records as that term is defined under the Federal Educational Rights and Privacy Act of 1974; and

b.      A duty to maintain the confidentiality of Plaintiff's research misconduct complaint and Plaintiff's concerns about retaliation.

147.    Defendants breached these obligations, including but not limited to by failing to maintain the confidentiality of Plaintiff's research misconduct complaint, retaliating against

Plaintiff and failing to prevent or remedy such retaliation, damaging Plaintiff's

reputation, and disclosing negative and private information about Plaintiff to some or all

of the Tufts veterinary community.

148. Plaintiff has suffered monetary and non-monetary damages from Defendants' unlawful

acts in amounts to be proven at trial, but likely to exceed $75,000.


## COUNT SIX
Violation of Privacy
Mass. Gen. Laws ch. 214, § 1B
(Defendants Tufts and Knoll)

149. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated

in the previous paragraphs.

150. By acts and statements including but not limited to sending an email concerning Plaintiff

to the entire Tufts veterinary community, Tufts and Dr. Knoll breached Plaintiff's

reasonable expectations of privacy.

151. This breach of privacy was unreasonable because, among other reasons, it breached

Plaintiff's rights to privacy in educational records under the Federal Educational Rights

and Privacy Act of 1974 and applicable regulations.

152. The breach of privacy was substantial and serious because, among other reasons, it

communicated private, negative, and false information about Plaintiff (including that a

pathologist believed she was "antisocial and weird," that she was undeserving of positive

evaluations, and that she was seeking positive evaluations that she did not deserve) to a

broad range of individuals including many who could or would be relevant to her current

and future career paths.

153. Plaintiff has suffered monetary and non-monetary damages from Defendants' unlawful

acts in amounts to be proven at trial, but likely to exceed $75,000.


## COUNT SEVEN
### Defamation
### (All Defendants)

154. Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

155. Dr. Knoll, acting on behalf of Tufts, published false and defamatory statements concerning Plaintiff to third parties, including but not limited to statements that a pathologist believed Plaintiff was "antisocial and weird," that Plaintiff received bad recommendations, and that Plaintiff was seeking to "require that everyone [at Tufts] give her a good evaluation even if it's not deserved."

156. Dr. Byrnes, acting within the scope of her employment at Tufts, published false and defamatory statements concerning Plaintiff to third parties, including but not limited to statements that Plaintiff had stolen data and materials from Dr. Byrnes' lab, interfered with her experiments, and engaged in other misconduct.

157. On information and belief, Defendants published additional false and defamatory statements concerning Plaintiff to third parties.

158. Defendants knew these statements to be false, acted in reckless disregard as to whether the statements were true or false, and/or acted negligently in failing to ascertain whether the statements were true or false before publishing them.

159. These statements constituted libel and/or prejudiced Plaintiff in her profession or business.

160. Plaintiff has suffered monetary and non-monetary damages from Defendants' unlawful

acts in amounts to be proven at trial, but likely to exceed $75,000.

WHEREFORE PLAINTIFF REQUESTS THAT THE COURT ORDER:

a. That judgment be entered for her and against Defendants;

b. That Defendants be ordered to cease and desist from their unlawful acts, and enjoined from such unlawful conduct in the future;

c. That Plaintiff be compensated for any loss of wages and/or benefits, and damage to reputation and earning capacity, incurred as a result of Defendants' unlawful acts;

d. That Plaintiff be awarded an amount of money that will fairly compensate her for the emotional and physical pain and suffering caused by Defendants' unlawful acts;

e. That Defendants pay Plaintiff's costs and attorneys' fees resulting from this action;

f. That Defendants pay Plaintiff interest on any judgment as provided by law;

g. That Defendants be ordered to pay Plaintiff multiple and/or punitive damages, to the extent such damages are available;

h. That Defendants be ordered to pay such relief as will make Plaintiff whole; and

i. That the Court order such other relief as may be just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted,
KRISTY MEADOWS,
By Her Attorneys,

/s/Rachel Stroup
Rachel Stroup (BBO #667410)
David A. Russcol (BBO #670768)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
rstroup@zalkindlaw.com
drusscol@zalkindlaw.com

Dated:  August 23, 2019